IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **LESLYN BYRD,** )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>**BURKE'S OUTLET STORES-ALA,** )<br>**INC.,** )<br>)<br>Defendant. | **CASE NO. 2:05CV423-F** |

**MEMORANDUM OF FACT AND LAW IN SUPPORT OF
DEFENDANT BURKE'S OUTLET-ALA, INC.'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Defendant Burke's Outlet-ALA, Inc. ("Burke's") respectfully submits this memorandum in support of its motion for summary judgment.

**I.   INTRODUCTION**

This action arises from Burke's decisions to terminate the employment of Leslyn Byrd ("Byrd"), a Store Manager for Burke's in its Andalusia, Alabama, store. Burke's terminated Byrd for poor performance of her job duties, specifically poor performance with regard to operations, communications with employees, and store morale. Byrd, an "African-Guyanan female,"[1] claims that Burke's termination of her employment was racially discriminatory in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") and 42 U.S.C. § 1981. Byrd's claims fail as a matter of law because: (1) Byrd cannot establish a prima facie case of discrimination, (2) Burke's has a legitimate, nondiscriminatory reason for terminating Byrd's employment, and (3) there is no evidence that Burke's stated reason for

---

[1] Byrd Complaint ¶ 4.

terminating Byrd's employment is pretextual. For these reasons, and because there is no genuine issue as to any material fact, the Court should enter summary judgment in favor of Burke's.

## II.    STATEMENT OF FACTS

### A.    Byrd's Employment with Burke's

Burke's is a wholly-owned subsidiary of Beall's Outlet Stores, Inc., which in turn is a wholly owned subsidiary of Beall's, Inc. Beall's Inc. operates a chain of discount retail stores under the Beall's Outlet and Burke's names in locations from Florida to California. Beall's is headquartered in Bradenton, Florida. (Byrd Ex. 11, p. 5; Byrd Depo. 207: 1-14).[2]

Burke's owns and operates a retail store in Andalusia, Alabama which sells clothing, house wares, gifts, and other miscellaneous items at discount prices. Each Burke's store is typically staffed by a Store Manager and several hourly employees. Among these hourly employees are Supervisors who assume some management responsibility in the absence of the Store Manager. Byrd applied for and was hired as a Supervisor by Burke's on February 14, 2000. (Byrd Ex. 14, Byrd Depo. 37: 14-16, 210: 19-23, 211: 1-2). At the time that Byrd began working at Burke's, Byrd received and read a copy of the Employee Handbook, which included a policy against discrimination and harassment. (Byrd Ex. 11 pp. 8-10; Byrd Depo. 207:1-14). Byrd acknowledged receipt of the Employee Handbook in her new hire acknowledgement statement. (Byrd Ex. 10; Byrd Depo. 206: 9-20).

On November 26, 2000, Burke's promoted Byrd from Supervisor to Store Manager at its Andalusia store. (Byrd Ex. 14: Byrd Depo. 210: 12-21). As Store Manager, Byrd supervised all store employees and reported to a Group Manager. (Byrd Exhibit 4; Byrd Depo. 227: 19-23, 228: 1-23, 229: 1-23). At the time of Byrd's promotion to Store Manager, Margaret Rountree

---

[2] The deposition of Leslyn Byrd will be referenced as "Byrd Depo." and the exhibits to her deposition will be referenced as "Byrd Ex."

("Rountree") was the Group Manager. (Rountree Aff. ¶ 2; Byrd Ex. 14: Byrd Depo. 210: 12-21). Rountree was Byrd's Group Manager from November 2000 to December 2001 and from October 2003 to July 2004. (Rountree Aff. ¶ 2). Due to a reorganization within Burke's, Byrd reported to other Group Managers between December 2001 and October 2003, but immediately after Byrd's promotion and during the final year of Byrd's employment with Burke's, Rountree was the Group Manager. (Rountree Aff. ¶ 2).

Among Byrd's duties as Store Manager was creating the work schedule for all employees and generally "promot[ing] teamwork among all employees." Additionally, Byrd was required as Store Manager to "[e]nsure proper maintenance and housekeeping of the entire store" and "[e]nsure the proper handling of merchandise functions within the store, including (but not restricted to) display, presentation, pricing policies, and sales events." (Byrd Ex. 4; Byrd Depo. 227: 19-23, 228: 1-23, 229: 1-23).

**B.    Problems with Byrd's Performance as Store Manager**

Shortly after Byrd's promotion to Store Manager, Rountree, Byrd's Group Manager, began to experience problems with Byrd's performance. (Rountree Aff. ¶ 2). Rountree encountered the following problems with regard to Byrd acting as Store Manager:

- Untimely bank deposits

- Scheduling problems – Employees complained to me that Ms. Byrd would constantly call them at home and ask them to work on their days off.

- Inadequate staffing - Ms. Byrd had an unusually high number of employee "no shows" which in turn often left the store with inadequate staffing (at least 2 people are required to be in the store at all times).

- Sloppy/Unorganized store appearance

- Harassment of one employee for taking leave under FMLA

- Long lunch breaks

170282.2                                           3

- Ms. Byrd was late for inventory at her own store.

- Ms. Byrd did not get along with the employees – At least one employee requested to be transferred to another store due to Ms. Byrd's actions as Store Manager.

(Rountree Aff. ¶ 3). Some employees actually contacted Rountree or other Group Managers directly to complain about Byrd's management of the store. (Twitty Aff. ¶ 2, Ex. A; Bryant Aff. ¶ 5, Ex. A).

Lisa Twitty ("Twitty"), an hourly employee/associate under the supervision of Byrd from May 2003 until Byrd's termination, was one of the employees who contacted Rountree directly regarding problems experienced with Byrd as Store Manager. (Twitty Aff. ¶¶ 1, 2). Twitty informed Rountree that there had been problems with the weekly employee work schedules issued by Byrd, and complained that Byrd had been asking her to work on her days off with little or no advance notice. (Twitty Aff. ¶ 2). Moreover, Twitty complained of Byrd's treatment of and demeanor towards her. (*Id.*). One incident occurred in 2004 when Byrd asked Twitty, with less than 24 hours notice, to work on her day off. (Twitty Aff. ¶ 2, Ex. A). Twitty responded that she already had plans and could not work on that day. (*Id.*). Byrd then took Twitty into Byrd's office and "[got] loud" with Twitty, telling her that if Twitty did not want to work at Burke's, then Twitty could easily be replaced. (*Id.*). Twitty left the office in tears and reported this incident to Rountree, who directed Twitty to record the incident in a statement, which is attached as Exhibit A to Twitty's Affidavit. (*Id.*). Twitty's statement concludes that "I've never had a manager treat me that way...I just would like to be treated a little better." (*Id.*).

Renee Bryant ("Bryant"), whose cousin is married to Byrd, was recruited by Byrd to work at Burke's. (Bryant Aff. ¶ 2). Bryant was hired as a cashier on February 15, 2003 and later promoted to Supervisor while under the management of Byrd. (Bryant ¶ 3). Like Twitty, Bryant also directly contacted the Group Manager, who at that time was Vickie Vaughn, to complain

about Byrd's scheduling of and treatment of employees. (Bryant Aff. ¶¶ 3, 4). In July 2003, Bryant and four other employees sent a letter to Vaughn complaining that Byrd would not timely provide the employees with their work schedule. (Bryant Aff. ¶ 5, Ex. A). The work schedule begins on Sunday and often schedules would not be posted until the preceding Friday; this late posting made it difficult for the employees to make personal plans and appointments. (*Id.*). The letter also notified Vaughn that Byrd "constantly nags and harasses the staff" and that working under Byrd is stressful, which has resulted in two Supervisors requiring medication for stress. (*Id.*). According to Bryant, she and the other employees decided to send the letter to the Group Manager because of three triggering events: (1) one employee had to go to the hospital for stress, which the employee attributed to her job, and then had to a wear a heart monitor; (2) one employee's child was ill and due to Byrd's failure to timely post the work schedule, the employee had difficulty in scheduling her child's doctor's appointments; and (3) three or four people had quit or been fired. (Bryant Aff. ¶ 5). Bryant ultimately requested to be transferred to Burke's Evergreen store so that she would not have to work with Byrd. She was transferred on September 26, 2003. (Bryant Aff. ¶ 3).

Both Twitty and Bryant testified that, in addition to scheduling problems, Byrd would belittle them and that Byrd was "moody" or "like two different people," noting her poor behavior towards themselves and the other employees. (Bryant Aff ¶ 4; Twitty Aff. ¶ 2). This poor behavior included yelling at employees and reprimanding or belittling employees in front of customers and employers. (*Id.*). Both also testified that working under Byrd was "stressful" and that work conditions improved at Burke's under new management. (Bryant Aff ¶ 4; Twitty Aff. ¶ 3).

C.    **Placement of Byrd on Burke's Performance Enhancement Plan and Her Termination**

On February 27, 2004, Rountree issued Byrd a verbal warning and told Byrd that she needed to improve in several areas. (Byrd Ex. 7; Byrd Depo. 144: 12-23, 145: 1-23). Rountree told Byrd that she needed to improve in markdowns, signage, recovery, and management of the work schedule. (*Id.*). Additionally, Rountree told Byrd that the must also work on staff morale and establish a better relationship with the employees. (*Id.*). Rountree met with Byrd again on March 9, 2004 to revisit these issues. (*Id.*) Because the issues has not been properly addressed or corrected by Byrd, Rountree and Burke's Regional Director of Stores, Richard Picone ("Picone"), placed Byrd on Burke's Performance Enhancement Plan ("PEP") on April 30, 2004. (*Id.*). Burke's PEP identifies employees whose job performance is unsatisfactory and who fail to comply with Burke's policies, and then assists those employees to improve their job performance. (Picone Aff. ¶ 4). When Byrd was placed on PEP, she offered to resign from Burke's, but Picone encouraged her to stay with Burke's, and told Byrd that he thought that she could improve her job performance and succeed. (Picone Aff. ¶ 3). Burke's PEP for Ms. Byrd consisted of three performance reviews, which included discussions as to how Ms. Byrd could improve her job performance. (Picone Aff. ¶ 5).

At the first PEP review on April 30, 2004, Picone and Rountree met with Byrd and informed her that her performance needed to improve with regard to store operations and her communication with the Andalusia store employees. (Picone Aff. ¶ 6; Byrd Ex. 7; Byrd Depo. 144: 12-23, 145: 1-23). As to operations, Byrd needed to get freight to the store floor, mark down merchandise, and post employee schedules in a more timely manner. Also, Byrd needed to improve the appearance of and timely post the signs in the store and improve the appearance of the store (increase "recovery" of items). (*Id.*). Byrd was also told that she needed to

communicate better with her staff and improve her relationship with the staff, including increasing store morale. (*Id.*). Another PEP review of Ms. Byrd performance was then scheduled to occur in 30 days. (*Id.*).

The second PEP review of Byrd conducted June 7, 2004, was done by Rountree. (Picone Aff. ¶ 7; Byrd Ex. 9; Byrd Depo. 149: 8-23). That review reflects that Byrd's job performance did improve with respect to operational standards. (*Id.*). As set forth in the PEP, Ms. Byrd "made some improvements" with regard to freight, markdowns, and signage. (*Id.*). However, the PEP also reflects that Ms. Byrd still needed to improve her performance with respect to store appearance ("recovery"), and that "[c]ommunications & store morale [are] still [an] issue," particularly the scheduling of employees for work. (*Id.*). The June 7, 2004 PEP scheduled another PEP review in 30 days and concluded that "if objectives [for job performance improvement] are not met could lead to termination." (*Id.*).

At the third PEP review on July 22, 2004, Picone and Rountree met with Byrd and determined that Byrd had not met the objectives set forth in the June 7, 2004 PEP and therefore should be terminated. (Picone Aff. ¶ 8; Byrd Ex. 8; Byrd Depo. 148:10-23, 149: 1-4, 150: 1-6). The July 22, 2004 PEP notes that store appearance ("recovery") still needed improvement and that communication with store employees was "still a problem." (*Id.*). With regard to communication with employees, the PEP specifically reflects a number of unresolved problems:

> Communication:  Still a problem.
>     1-    Associates calling Regional
>           twice since 6-7-04.
>     2-    Associates calling D. M. [District Manager]
>     3-    Statements written to D. M. [District Manager]
>               A- Scheduling problems
>               B-  Being treated unfairly
>               C- Reprimanded in office and sales floor
>                  in loud tone.  Being called names {lier, evil}
>               D- Having favorites giving more hours to new

>       employees than others.
> 4-    Management schedule still problem. Changing schedule. Not letting D. M. [District Manager] know personally. With voice mail.
> 5-    Overall poor morale in store due to the above mentioned issues.
>
> Ultimately the responsibility of the store Manager to create a fair and good working environment. This has not happened at store 347. Nor do we feel at this point it will improve.

(*Id*.). Based upon the foregoing, Picone and Rountree concluded Ms. Byrd would not improve her job performance with regard to communication with the employees or store morale and, therefore, the PEP review of Ms. Byrd resulted in termination. (*Id*.).

At no time did Byrd complain or even mention to Rountree or Picone that she felt discriminated against based upon race or upon any other grounds. (Rountree Aff. ¶ 4; Picone Aff. ¶ 9; Byrd Depo. 147: 4-23, 148: 1-4). Byrd never complained to Burke's regarding any alleged discrimination until after her termination.[3] (*Id*.; Byrd Depo. 221:1-23, 223: 1-5).

---

[3] Paragraph 12 of Byrd's Complaint alleges that Byrd "was fired after she requested a meeting with her Supervisor and Management Officials to discuss the racial discrimination." However, Byrd admitted in her deposition testimony that she did not tell Rountree or Picone that she wanted to meet to discuss "racial discrimination." Byrd testified:

> Q.   Okay. Now, paragraph twelve says: On July 22, 2004, Plaintiff was fired after she requested meeting with her supervisor and management officials to discuss racial discrimination. Did I read that correctly?
> A.   Yes, sir.
> Q.   And the supervisor was Margaret Rountree. And management officials would have been Richard Picone?
> A.   That I wanted to discuss this with?
> Q.   Yes, ma'am.
> A.   I wanted to have a meeting with both of them.
>
> . . .
>
> Q.   When you called Margaret, you didn't tell her: I want to talk about racial discrimination, did you?
> A.   No.
> Q.   <u>They didn't know that's what you wanted to talk about, did they?</u>
> A.   <u>I just wanted to have a meeting</u>.

**D.     Events After Byrd's Termination**

Almost one month after termination of her employment with Burke's, Byrd sent a letter to the Chairman and CEO of Beall's Inc., which is the parent company of Burke's, alleging that she was discriminated against due to her "race, national origin, and sex." (Byrd Ex. 19; Byrd Depo. 221: 1-17)  The Director of Human Resources for Beall's Inc. contacted Byrd to investigate Byrd's allegations. (Byrd Depo. 222:17-23, 223:1-8). A representative from Beall's human resources, Joyce Penrod ("Penrod"), traveled to Andalusia to meet with Byrd on September 21, 2004.[4]  (Byrd Ex. 20; Byrd Depo. 222:6-23, 223: 1-21).  At that meeting, Byrd refused to provide the information requested by Penrod -- information which was necessary for Burke's investigation -- based upon the advice of her counsel. (Byrd Ex. 20; Byrd Depo.

---

(Byrd Depo 182: 2-16, 183: 8-15) (emphasis added).

Byrd clarified that she did not complain of any alleged discrimination until after her employment was terminated:

> Q.   Let me show you what I'm marking as Defendant's Exhibit 19. And let me ask you if this is a copy of a letter that you sent to Bealls on or about August 26, 2004? ... Do you recognize that document?
> A.   Yes.
>
> . . .
>
> Q.   Okay. You indicate in the conclusion that there is a pattern of discrimination based on race, national origin and sex carried out by Burke's employees and senior management. Do you see where I'm talking about there?
> A.   Yes.
> Q.   Is that the first time you had told anybody at Bealls or Burke's that you believed that to be the case?
> A.   Yes.

(Byrd Depo. 221: 1-23; 222: 1-5)(emphasis added).

[4] The meeting was postponed twice due to two hurricane warnings posted in Florida and Alabama. (Byrd Depo. 223:22-23, 224:1-2).

223:12-21; 225: 17-23) Thus, Burke's completed an investigation based upon the information available to it, and found no evidence of discrimination. (Byrd Ex. 20; Byrd Depo. 223:12-21).

Byrd filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the EEOC issued a Dismissal and Notice of Suit Right on February 25, 2005. (Byrd Ex. 5; Byrd Depo. 70:1-15). Byrd then filed the above-styled complaint with this Court on May 6, 2005. (Byrd Ex. 6; Byrd Depo. 70:1-15).

**E.    Byrd's Complaint**

As grounds for her Title VII and § 1981 race discrimination claims, Byrd alleges that:

- She was "forced to re-hire a white woman and pay her more than comparable co-workers."
- Her "Group Manager (white) [Rountree] "failed to support her managerial actions where they involved a white."
- Her "complaints about job deficient performances were ignored by Management."

(Complaint ¶¶ 7, 8, 10). As damages, Byrd seeks "monetary damages of no less than" $500,000.00 for "pain, humiliation, suffering, and financial loss." (Complaint, Section V). Byrd also seeks punitive damages "of no less that ten (10%) percent of Defendant's gross revenues for 2002, 2003, and 2004." (*Id.*).

**III.    SUMMARY JUDGMENT STANDARD**

Summary judgment pursuant to *Fed. R. Civ. P*. 56, is mandated when, under the standards applied by the substantive law, there is insubstantial evidence to establish a material issue of fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986). In order to defeat a motion for summary judgment, a plaintiff may not rest merely on his pleadings, but must present admissible evidence that raises a genuine issue of material fact. *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient . . ." *Anderson*, 477 U.S. at 252. The evidence offered by the non-

moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electronics Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). This standard applied to the facts of the present case mandates that Burke's motion for summary judgment be granted in its entirety. Summary judgments in favor of defendants in cases such as the one at bar are hardly rare, *See e.g. Earley v. Champion Intern'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990); *Chapman v. AI Transport*, 229 F.3d 1012, 1025 (11th Cir. 2000), and are a favorite means of disposing of litigation. *See e.g. Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

IV. **DISCUSSION**

A. **Byrd's Title VII and § 1981 Claims Must Fail as a Matter of Law Because: (1) Byrd Cannot Establish a Prima Facie Case of Discrimination, (2) Burke's Had a Legitimate, Nondiscriminatory Reason for Terminating Byrd's Employment, and (3) There is No Evidence that Burke's Stated Reason for Terminating Byrd's Employment is Pretextual.**

Byrd alleges that Burke's terminated her employment based on her race in violation of Title VII and § 1981. Because Byrd relies only on circumstantial evidence to support her allegations, the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981), controls the Court's analysis of both claims.[5] *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000). Under the *McDonnell Douglas/Burdine* framework, the plaintiff carries the initial burden of establishing a prima facie case of discrimination and must show an inference of discriminatory intent. *McDonnell Douglas*, 411 U.S. at 802; *see Holifield v. Reno*, 115 F.3d 1555, 1561-62

---

[5] "Because Title VII and § 1981 'have the same requirements of proof and use the same analytical framework,'" this brief will "'explicitly address the Title VII claim[s] with the understanding that the analysis applies to the § 1981 claim[s] as well.'" *Pate v. West Publ'g Corp.*, No. 2:04CV1131-T(WO), 2006 WL 13156, at *3 (M.D. Ala. Jan. 3, 2006) (quoting *Standard v. A.B.E.L. Servs.*, 161 F.3d 1318, 1330 (11th Cir. 1998)).

(11th Cir. 1997). Once the plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the employment action. *McDonnell Douglas*, 411 U.S. at 802. If the defendant is able to meet its burden, the plaintiff must then show by substantial evidence that the proffered reason is merely a pretext for discrimination. *Burdine*, 450 U.S. at 253.

In the present case, Byrd's race discrimination claims are due to be dismissed because Byrd cannot establish a prima facie case of discrimination. Even if Byrd could meet her initial burden, Burke's is still entitled to summary judgment in its favor because it had a legitimate, nondiscriminatory reason for terminating Byrd's employment, and there is no evidence that Burke's stated reason for terminating Byrd's employment is pretextual.

   1.  <u>Byrd cannot establish a prima facie case because she cannot show that she was treated less favorably than a similarly situated individual outside her protected class or that her former position was filled by a non-minority</u>.

To succeed with a discriminatory discharge claim, a plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for the job from which she was discharged; (3) she was discharged; and (4) she was treated less favorably than a similarly situated individual outside her protected class or that her former position was filled by a non-minority. *Maynard v. Bd. of Regents*, 342 F.3d 1281, 1289 (11th Cir. 2003).

Byrd cannot show that Burke's treated her less favorably than some similarly situated individual outside her protected class. "In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Holifield*, 115 F. 3d at 1562. "The most important factors in the disciplinary context . . . are the nature of the offenses committed and the nature of the punishment imposed." *Silvera v. Orange*

*County Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001) (quotation omitted)).  Summary judgment is appropriate if the plaintiff fails to show the existence of a similarly-situated employee, and no other evidence of discrimination is present.  *Holifield*, 115 F.3d at 1562 (citation omitted).

Byrd's employment was terminated because store appearance ("recovery") was not satisfactory, and because she neither improved in her communications with employees nor improved store morale.  Burke's termination occurred only after she had received a verbal warning on February 27, 2004, a meeting to revisit the verbal warning on March 9, 2004, and three additional reviews under Burke's PEP on April 30, 2004, June 6, 2004 and July 22, 2004, respectively, with regard to these issues.  Burke's provided Byrd with almost five months to improve her job performance and even provided assistance under its PEP for improvement; yet, Byrd showed little or no improvement at all.  Byrd was treated very favorably, as she was given several warnings prior to her ultimate termination.  Byrd cannot identify any non-African-Guyanan Store Manager (or any other Burke's employee for that matter) who has engaged in a similar pattern of unsatisfactory performance but has not been fired.

Byrd alleges discrimination in that she was "forced to re-hire a white woman and pay her more than comparable co-workers."  (Complaint ¶ 7).  However, Byrd admits that the employee in question had previously been employed by Burke's,[6] to her knowledge was eligible for re-hire, and that it was not unreasonable for Rountree to rehire the employee under those circumstances.[7]

---

[6] The employee had previously been employed as a Store Manager at another Burke's store and Burke's rehired her as a Supervisor, subordinate to Byrd. (Byrd Depo. 114:3-13).

[7] Byrd testified:

Q. Okay. So, in March, 2004, it says:  You were forced to rehire a white woman.  And would that be -- Is that a reference to Beverly Armstrong?
A. Yes, sir.
Q. Okay. How is it that you were forced to rehire Beverly Armstrong?  Tell me what happened there.
A. Margaret told me I had to rehire her.

170282.2                                13

(Byrd Depo. 160:14-23, 161:1-23, 162: 1-15.). As to the allegation that Byrd was forced to pay the woman "more than comparable co-workers," Byrd could not recall the hourly rate of the woman, did not know Rountree's reasons for setting the woman's hourly rate, and admitted that she did not know whether Rountree's reasons were discriminatory.[8] (Byrd Depo. 164: 8-23, 165: 1-16).

---

. . .

Q. Why did she want to -- Why did she want you to hire her, did she say?
A. She didn't say it in words. Beverly used to work for Burke's, managed the other store and left and wanted to come back.

Q. So, she had some experience working for Burke's?
A. Yes.

. . .

Q. Okay. Why did she leave, do you know?
A. Her reasons, no.
Q. Okay. Why did she want to come back, do you know?
A. No.
Q. Okay. I take it that when she left, she left under circumstances that allowed her to be reemployed?
A. I would think so.
Q. Okay. And you can leave under circumstances whereby you're not allowed to be reemployed; is that right?
A. I would think so.
Q. Okay. Would it be reasonable for Burke's to want to rehire an employee who had been a good employee and an experienced employee in the past?
A. I would think so.
Q. Okay. So, it was reasonable for Margaret to want to rehire Ms. Armstrong?
A. Yeah, I would think so.

(Byrd Depo. 160:14-23, 161: 1-23, 162:1-15)(emphasis added).

[8] Specifically Byrd testified:

Q. Okay. And you had to pay her more than comparable coworkers. What does that mean?
A. Well, she was rehired as a supervisor. And the supervisor pay was a certain amount they paid every supervisor, but she came in at a different rate.
Q. What rate did she come in at?

Byrd also alleges that her "Group Manager (white) [Rountree] failed to support her managerial actions where they involved a white." (Complaint ¶ 8). Basically, Byrd claims that her complaints to Rountree regarding employees were ignored. Byrd offers two instances of this happening. One involved a Supervisor saying a curse word on the store floor[9] and the other involved a dispute with a Supervisor regarding the work schedule and Byrd's aggravation that the Supervisor's fiancé would visit the store. (Byrd Depo. 111:20-23, 112:1-10, 116: 11-23, 117: 1-23, 118:1-4, 135:11-23, 136: 1-18). However, in both instances, Byrd was not sure as to whether Rountree ever spoke with the employees or not and conceded that Rountree could have reprimanded these employees without Byrd's knowledge. (Byrd Depo. 117:20-23, 118:1-4, 138:19-23, 139: 1-11).

Finally, Byrd alleges that her "complaints about job deficient performances were ignored by Management."[10] (Complaint ¶ 10). Under Burke's procedures, a Store Manager cannot "write

---

| | | |
|---|---|---|
| A. | I couldn't remember the exact figure. | |
| Q. | What rate was the supervisor rate of pay? | |
| A. | Probably six dollars, 6.50, 6.25. Something like that then. | |
| Q. | And you don't have any idea what she came in at? | |
| A. | The exact figure, no, sir. | |
| Q. | Okay. Were you given an explanation for that? | |
| A. | No. I just was told how much she was going to be hired at. | |
| Q. | Okay. And did you ask Margaret why she would be hired at that amount? | |
| A. | No. | |
| Q. | So you don't know Margaret's reasons for paying that? | |
| A. | (Witness shakes head in the negative.) | |
| Q. | <u>And you don't know whether her reasons were discriminatory or not</u>? | |
| A. | <u>No.</u> | |

(Byrd Depo. 164: 8-23, 165: 1-16) (emphasis added).

[9] The curse word was "S-H-I-T" (Byrd Depo. 115:10-23).

[10] Byrd also alleges in her Complaint that "whites under [her] supervision did not respect her and flouted her work-related rules/demands." (Complaint ¶ 9). This is not an allegation

up" an employee without the Group Manager's approval. (Byrd Depo. 173: 19-23, 174: 1-6). There were instances where Byrd wanted to "write up" employees based upon poor job performance, but Rountree declined. (Byrd Depo. 176:3-20) Byrd admitted that Rountree was more lenient with the employees than Byrd, and conceded that at times Rountree's decision not to write up an employee was correct.[11] (*Id*.).

Thus, as evidenced by her own deposition testimony, Byrd's allegations of race discrimination are unfounded. Byrd cannot show that she was treated less favorably than a similarly situated individual outside her protected class. She thus has no prima facie case. As such, Byrd's claims must fail as a matter of law.

---

recognized by Title VII and § 1981 because it is her subordinates of whom she complains, not management.

In any event, Byrd's claim does not have merit because as evidenced by the Affidavit of Renee Bryant, an African-American and cousin to Byrd's husband, the discord between Byrd and the employees was not limited to whites but extended to other races as well. (Bryant Aff. ¶¶ 3-5, 7)

[11] Byrd testified:

> Q. Did Margaret ever tell you: No. You can't write that up?
> A. Yes.
> Q. Did she just say: Is that really serious? What did she say to you?
> A. I mean, sometimes she said: Well, just wait, or maybe we'll watch it next time, or we'll do it next time or things like that.
> Q. So, sometimes she wanted to be more lenient than you did?
> A. Yes.
> Q. Okay. <u>And did you ever think she was right in that</u>?
> A. <u>Well, she could be in some places</u>, but then if it's a continuous thing with that person, then what's going to happen then?

(Byrd Depo. 176: 3-20) (emphasis added)

      2.    <u>Burke's can articulate a legitimate, nondiscriminatory reason for terminating Byrd's employment.</u>

An employer's obligation to articulate a legitimate, nondiscriminatory reason for the challenged employment action arises only when the plaintiff can establish a prima facie case, which Byrd cannot do. *Holifield*, 115 F.3d at 1564. In any event, the employer's burden at this stage is "exceedingly light." (*Id.*). It requires only that the employer produce evidence that would allow a reasonable fact-finder to conclude that the adverse employment action was not made for a discriminatory reason. *Davis v. Qualico Miscellaneous, Inc.*, 161 F. Supp. 2d 1314, 1321 (M.D. Ala. 2001).

Burke's had a legitimate reason for terminating Byrd's employment. Failure to perform or satisfactorily perform one's job duties is a legitimate reason for terminating employment. *See Kelliher v. Veneman*, 313 F.3d 1270, 1276 (11th Cir. 2002) (Failure to perform job duties and "intimidation and mistreatment of subordinate employees" are legitimate, nondiscriminatory reasons for termination of employment.). Among her duties as Store Manager, Byrd was required to create the work schedule for all employees and generally to "promote teamwork among all employees." (Ex. 4; Byrd Depo. 227: 19-23, 228: 1-23, 229: 1-23). Additionally, Byrd was required as Store Manager to "[e]nsure proper maintenance and housekeeping of the entire store" and "[e]nsure the proper handling of merchandise functions within the store, including (but not restricted to) display, presentation, pricing policies, and sales events." (*Id.*). Byrd's employment was terminated because after five months and five meetings with Burke's management, Byrd still had communication problems with the staff, scheduling problems, and low store morale and the store appearance ("recovery") still needed improvement. Moreover, after working with Byrd under Burke's PEP, Rountree and Picone, the persons to whom Byrd directly reported, determined that Byrd's deficient performance was not likely to improve.

Accordingly, Burke's can articulate a legitimate, nondiscriminatory reason for terminating Byrd's employment.

### 3. There is no evidence that Burke's stated reason for terminating Byrd's employment is pretextual.

After the defendant carries its burden of production by articulating a legitimate, nondiscriminatory reason for the adverse employment action, the plaintiff must then discredit the proffered reason. *Combs v. Plantation Patterns, Meadowcraft, Inc.*, 106 F.3d 1519, 1528 (11th Cir. 1997). To show the proffered reason is merely a pretext, the plaintiff must:

> demonstrate that the proffered reason was not the true reason for the employment decision . . . [The plaintiff] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly showing that the employer's proffered explanation is unworthy of credence.

*Burdine*, 450 U.S. at 256; *Combs*, 106 F.3d at 1528. Specifically, the plaintiff must produce sufficient evidence to allow a reasonable finder of fact to conclude that the defendants' articulated reasons are not believable. *Id.*; *McDonnell Douglas*, 411 U.S. at 804. A plaintiff can accomplish this by pointing to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the proffered explanation. *Combs*, 106 F.3d at 1528 (quotation omitted). "[T]o avoid summary judgment [the plaintiff] must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination." *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1228 (11th Cir. 1993). A reason is not pretext for discrimination "unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515 (1993).

In the present case, Byrd cannot present any evidence that would allow a reasonable factfinder to conclude that Burke's articulated reason for terminating her employment is not believable, or that race was a motivating factor. Simply put, the stated reasons are true. Byrd

cannot plausibly deny that she did not satisfactorily perform her job duties, particularly in light of the five meetings she had with Burke's management over the five months preceding her termination. The reasons for termination of Byrd's employment due to poor performance of her job duties are clearly documented by Burke's under its PEP, and in some instances those PEP documents are signed by Byrd. There are no "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Burke's reason that would suggest that the reason is unworthy of credence. Byrd is unable to present any evidence, much less "significantly probative evidence," that Burke's stated reason for terminating Byrd's employment is pretextual or that race played any role whatsoever in the decision. Thus, Byrd's Title VII and § 1981 claims must fail as a matter of law.

## V.    CONCLUSION

Because (i) Byrd cannot demonstrate a prima facie case of race discrimination, and (ii) Burke's can articulate a legitimate, nondiscriminatory reason for terminating Byrd's employment that (iii) is not pretextual, Byrd's Title VII and § 1981 claims must fail as a matter of law. The application of the controlling legal standards to the undisputed material facts compels the dismissal of all of Byrd's claims. For the foregoing reasons, Burke's motion for summary judgment should be granted as to all claims.

s/JoClaudia Moore<br>
One of counsel for defendant<br>
Burke's Outlet Stores-ALA, Inc

OF COUNSEL:
Dorman Walker (WAL086)
JoClaudia Moore (MIT033)
Balch & Bingham LLP
Post Office Box 78
Montgomery, Alabama 36101
334/834-6500
334/269-3115 (fax)

## CERTIFICATE OF SERVICE

I certify that on July 28, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing and/or that a copy of the foregoing has been served upon the following by United States Mail, properly addressed and postage prepaid, to the following:

Malcolm R. Newman
Post Office Box 6137
Dothan, Alabama  36302

s/JoClaudia Moore
Of Counsel
