Page 1

1              IN THE UNITED STATES DISTRICT COURT

2             FOR THE MIDDLE DISTRICT OF ALABAMA

3                       SOUTHERN DIVISION

4

5      CASE NUMBER:   2:05 CV-423-F

6      Leslyn Byrd,

7              Plaintiff,                    📄 **COPY**

8              vs.

9      Burke's Outlet Stores-ALA, Inc.,

10             Defendant.

11

12              S T I P U L A T I O N

13             IT IS STIPULATED AND AGREED by and

14     between the parties through their respective

15     counsel, that the deposition of Leslyn Byrd

16     may be taken before Sara Mahler, CSR, at the

17     offices of Malcom Newman, at 219 West

18     Crawford Street, Dothan, Alabama 36301, on

19     the 17th day of February, 2006.

20

21

22             DEPOSITION OF LESLYN BYRD

23                                          46457

FOSHEE & TURNER COURT REPORTERS

1      Q.      Who did you interview with?

2  Was it somebody from Burke's or somebody --

3      A.      It was someone from Burke's.

4      Q.      Do you recall who that was?

5      A.      The name of the person, no.

6      Q.      Was it a district manager or

7  regional manager?

8      A.      I don't recall who it was.  I

9  just remember it was a woman.

10      Q.      Was it anyone that you saw,

11  after you became an employee, again?

12      A.      No.  I don't think she was no

13  longer with the company after a while.

14      Q.      And were you originally hired,

15  I believe, as a supervisor?

16      A.      Originally, yes.

17      Q.      Okay.  How long had the store

18  been operating when you were hired?

19      A.      Well, we started it,

20  basically.

21      Q.      Oh, you started it?

22      A.      Yes.

23      Q.      Okay.  Who was the store

FOSHEE & TURNER COURT REPORTERS

Page 70

1                              purposes.)

2         Q.      Okay.   Thank you.   Let me ask

3    you, then, about -- Before we started after

4    our recess from lunch, I asked you to look

5    over the complaint and the EEOC charge.   And

6    I'm going to mark -- Let me have those back

7    please.   I'm going to mark these 5.   5 will

8    be the EEOC charge.

9                         (Defendant's Exhibit 6 was

10                        marked for identification

11                        purposes.)

12        Q.      And six will be the complaint.

13   Have you read over the EEOC charge and the

14   complaint.

15        A.      Yes.

16        Q.      Are you ready to discuss

17   those?

18        A.      Yes.

19        Q.      Okay.   Look at Exhibit 3,

20   please.   Those are your notes.   Do these

21   relate to the allegations made in your

22   complaint?

23        A.      Some of them, yes.   Most of

FOSHEE & TURNER COURT REPORTERS

1  telling my subordinates what you want done,

2  would you call and tell me too so that I'm

3  equally informed?

4        A.      I never called her and tell

5  her about it.

6        Q.      Okay.  Let's look at page

7  three-A, please.  That's the one -- yeah,

8  that one right there.  Now, was this note

9  written on 3/17/04?

10       A.      3/13?

11       Q.      3/13.  I'm sorry.  I misread

12  it.  No.  Excuse me.  7/13/04.  Let me clean

13  that up and ask it all over again.

14             Was this note on page three-A

15  written on July 13, 2004?

16       A.      The date it happened.

17       Q.      Is that a yes or no?

18       A.      That was the date it actually

19  happened.

20       Q.      Okay.  And if I may read it --

21  Tell me if I read it wrong:  Telling

22  supervisor what need to be done, she got

23  very upset, cursed at me, went out on the

**FOSHEE & TURNER COURT REPORTERS**

1    sale's floor, speak real loud.  I told

2    Margaret about this.  She said:  Maybe she

3    was just having a bad day.  What's that --

4    What are those last three words?

5         A.    And that's it.

6         Q.    And that it.  Okay.  Who was

7    the supervisor?

8         A.    Beverly.

9         Q.    Beverly Armstrong?

10        A.    Yes, sir.

11        Q.    And give me some information

12   about what happened here, please.

13        A.    Basically, that's what it is.

14   I was just -- I was telling Beverly what to

15   do and --

16        Q.    What were you telling her to

17   do?

18        A.    I think it was, basically --

19   We were either putting stock out -- Beverly

20   was the supervisor -- Well, you don't want

21   to hear that.

22             MR. NEWMAN:  He wants you to

23   answer the question.

**FOSHEE & TURNER COURT REPORTERS**

Page 114

1  back?

2      A.    Right.

3      Q.    And isn't it correct that when

4  she came back, she had been a store manager

5  at another store?

6      A.    Uh-huh.  Yes.

7      Q.    And then, you had hired her

8  back as your subordinate, as a supervisor?

9      A.    Well, I was told to rehire

10  her.

11      Q.    Okay.  She was hired back as a

12  supervisor?

13      A.    Supervisor.

14      Q.    Are you saying that that

15  caused some friction between you and she?

16      A.    Yes.  Uh-huh.

17      Q.    Okay.  Did she -- Was there

18  something particular here at this time that

19  caused her to get upset and curse at you?

20      A.    I don't recall what happened

21  that would cause her to curse at me.

22      Q.    Okay.  How could you tell she

23  was upset?

FOSHEE & TURNER COURT REPORTERS

Page 115

1    A.    She was upset because I

2    think -- Let me see.  I could tell she was

3    upset because she cursed.  And you don't

4    curse at the manager.

5        Q.    I guess that's a good way to

6    tell.

7        A.    You just don't, no matter how

8    upset you are.  You could just cool off

9    by --

10       Q.    Do you recall what her

11   specific words were, Ms. Byrd?

12       A.    Do I have to say what she said

13   says?

14       Q.    I know you probably don't want

15   to be talking that way, but, yes, ma'am, I

16   think it would be good if you put it into

17   the Record?

18       A.    I think she actually used the

19   S word.

20       Q.    S-H-I-T?

21       A.    Yes.

22       Q.    Just said S-H-I-T?

23       A.    Uh-huh.

FOSHEE & TURNER COURT REPORTERS

1    Q.    Did she say it under her

2    breath or did she yell it?

3    A.    No.  It was out loud.

4    Q.    You said:  Do that, and she

5    said:  S-H-I-T?

6    A.    It was real loud on the floor.

7    Q.    All right.  Did she say

8    anything else?

9    A.    If she did, I couldn't hear

10   that because I walked off.

11   Q.    Okay.  I understand.  And you

12   told Margaret about this.  How did you tell

13   Margaret?

14   A.    I called her on the phone.

15   Q.    Is there any record of that?

16   Was there a record that you were supposed to

17   keep when you wanted to take disciplinary

18   action?

19   A.    There was, but your supervisor

20   has to sign off on it.

21   Q.    Okay.  So, was there any

22   document which you created related to this

23   that would be at Burke's?

FOSHEE & TURNER COURT REPORTERS

Page 117

1       A.      No.  Because, first, you have

2   to speak to your supervisor about it.  And I

3   spoke to Margaret about it and --

4       Q.      What did you tell Margaret, as

5   close as you can remember?

6       A.      Exactly, at that time, I

7   called her up on the phone and I told her

8   exactly what happened.

9       Q.      Okay.  And you felt that

10  Margaret, I take it, did not back you up?

11      A.      No.

12      Q.      Okay.  Did you think that had

13  anything to do with your race?

14      A.      Yes.

15      Q.      Why is that?

16      A.      Because if a manager complain

17  about a supervisor, especially cursing at

18  them, something should have been done about

19  it.

20      Q.      Okay.  Do you know if Margaret

21  ever spoke with -- I mean -- Excuse me.  Do

22  you know if Margaret ever spoke with Beverly

23  about this matter?

FOSHEE & TURNER COURT REPORTERS

Page 118

1      A.      No.

2      Q.      Okay.  So, she may have spoken

3  with her and you don't know about it?

4      A.      She could have.  I don't know.

5      Q.      Okay.  Let's look at page

6  four, please.  The top paragraph:  Margaret

7  waits until I go to lunch or out and then

8  comes in to change things around.  Have we

9  covered that already?

10     A.      Pretty much.

11     Q.      Okay.  Anything to add to

12  that?

13     A.      No.

14     Q.      Okay.  The next one:  June

15  13th, left store 307.  That's Troy?

16     A.      307, July.

17     Q.      July.  Okay.  Why don't you

18  read it.

19     A.      July the 13th, was store 307

20  inventory.  Margaret never say anything

21  until the day before, after lunch.  She

22  called to say she wants me to go to Troy,

23  which is 307, to help inventory is six p.m.

FOSHEE & TURNER COURT REPORTERS

Page 135

1    they were exclusively black people who were

2    called in, or were there blacks and whites

3    called in?

4         A.    I couldn't tell you that.

5         Q.    You don't know?

6         A.    No.  Huh-uh.

7         Q.    Okay.  Who would have been

8    responsible for calling people in from other

9    stores, Margaret?

10        A.    Margaret.

11        Q.    Okay.  Read your entry for the

12   19th, please.

13        A.    Opened my store for 7:30 p.m.

14   Left store about 6:30 p.m.  Margaret visit

15   store to sign off on check list.

16        Q.    Okay.  And why don't you

17   continue reading that entry:  It seems like.

18        A.    I told her I had called

19   supervisor to the office to ask her why she

20   didn't work her scheduled hours.  Got very

21   defensive.  Said:  It should be her time

22   off, et cetera, and walked out.

23              I didn't get to finish talking

Page 136

1    to her.  Also, I wanted to talk to her about

2    her fiance constantly coming up to the

3    workplace, bringing soda or something.  He

4    was always bringing something up there.

5    Spoke to Margaret about the situation.  She

6    was basically defending supervisor.

7    Margaret's way about.

8         Q.     I think it's:  On Margaret's

9    way out.

10        A.     On Margaret's way out, she

11   said -- Okay.  She came up to the store.  On

12   Margaret's way out she said:  Leslyn, where

13   is Angela?  She left me a voice mail.  I

14   called her, Angela, they were outside.  --

15   They went outside to talk and Margaret left.

16        Q.     Okay.

17        A.     Basically, Margaret and the

18   supervisor went outside to talk.

19        Q.     Okay.  Let's see.  Was it

20   appropriate for Margaret to visit your store

21   to sign off on the checklist?

22        A.     Sure.

23        Q.     What does that mean?

FOSHEE & TURNER COURT REPORTERS

Page 138

1          A.      Yes.

2          Q.      Tell me what she said -- what

3    Margaret said.

4          A.      Well, after telling Margaret

5    about Angela -- Margaret always defended

6    supervisors.  She never give you no basic

7    explanation about anything.  Her way of

8    defending that supervisor, she take the

9    supervisor outside.

10              She did not call the

11   supervisor in the office with me, or maybe

12   take the supervisor in the office and talk

13   to her concerning the complaint I've made.

14   She didn't do any of such.  She just took

15   the supervisor, on the way out, she was

16   leaving, take the supervisor out on the

17   sidewalk, talk to the supervisor and she

18   left.

19          Q.      Did she counsel the supervisor

20   about her job performance?

21          A.      I wouldn't know, because she

22   took her outside on the sidewalk.

23          Q.      So, you don't know what they

**FOSHEE & TURNER COURT REPORTERS**

Page 139

1    did out there?

2          A.       Exactly.

3          Q.       Did you call her and say:

4    Hey, what were talking to Angela about?

5          A.       No, I didn't.

6          Q.       Did you call her and say:  Did

7    you counsel Angela?

8          A.       No, I didn't.

9          Q.       So, she could have counseled

10   Angela and you just didn't know?

11         A.       Exactly.  She could have.

12         Q.       Let's look at the next page,

13   please.  Would you read that.

14         A.       That's the last one?

15         Q.       Yes, ma'am.

16         A.       Call Margaret to set up an

17   appointment with her and Richard.  Margaret

18   called me back and said:  Richard was doing

19   inventory this week, and how soon I need

20   this meeting?  I said:  ASAP, so I can make

21   sure I have coverage.  Also, I told

22   Margaret:  I will pull a double on Thursday

23   to get the weekend.

**FOSHEE & TURNER COURT REPORTERS**

Page 144

1    A.    Yes.  I think that's what it

2  was.

3    Q.    Now, you were put on a

4  Performance Enhancement Plan in April?

5    A.    April the 30th.  I was

6  terminated on July the 22nd.

7    Q.    Yes.

8    A.    Okay.

9          (Defendant's Exhibit 7 was

10          marked for identification

11          purposes.)

12    Q.    So, you had already signed the

13  performance -- Let me show you -- Take a

14  moment to look at the document I have marked

15  as Exhibit 7.  Tell me, after you've done

16  that, please.

17    A.    Okay.

18    Q.    Now, can you identify this

19  document, please?

20    A.    I can.

21    Q.    What is it?

22    A.    I guess this is the

23  Enhancement Plan.

Page 145

1      Q.      Okay.  And it says that it's

2   dated on 4/30/04; is that correct?  Here and

3   down here (indicating.)

4      A.      I see that.

5      Q.      Okay.  And that first

6   signature, the employee's signature, whose

7   signature is that?

8      A.      That's mine.

9      Q.      And the second signature, the

10  manager's signature, whose is that?

11     A.      It looks like Margaret's.

12     Q.      Okay.  And do you recognize

13  the third signature as Richard's, the

14  witness signature?

15     A.      I think it's Richard's.

16     Q.      It says:  Richard something.

17     A.      Yes.

18     Q.      Okay.  And were you present

19  when those were signed?

20     A.      Yes.

21     Q.      And were they all signed on

22  April 30, '04?

23     A.      Uh-huh.

FOSHEE & TURNER COURT REPORTERS

1    said that:   Leslyn, I don't think it's

2    working out with us, and we're going to have

3    to let you go.

4         Q.     Okay.  And at that time, did

5    you tell Richard that you thought you had

6    been discriminated against on the basis of

7    your race?

8         A.      I didn't have time to talk to

9    Richard.  He left the office and went

10   outside on his cell phone.

11        Q.      Is that a no, you did not tell

12   him that?

13        A.      Huh-uh.  No.

14        Q.      Did you at any time tell

15   Richard that you --

16        A.      No.

17        Q.      Let me finish the question,

18   otherwise, it gets confusing.  Did you at

19   any time tell Richard that you thought you

20   were being discriminated against because of

21   your race?

22        A.      No.

23        Q.      Did you at any time tell

FOSHEE & TURNER COURT REPORTERS

Page 148

1   anyone at Burke's or its parent company,

2   Bealls, that you thought you were being

3   discriminated against because of your race?

4          A.      No.

5                          (Off-the-Record discussion

6                          was held.)

7                          (Defendant's Exhibit 8 was

8                          marked for identification

9                          purposes.)

10         Q.      Okay.  Let me show you --

11  Have you had a chance to look at Exhibit 8?

12         A.      8, yes.

13         Q.      Can you identify that

14  document, please?

15         A.      I don't recall seeing this.

16                 MR. NEWMAN:  Yes or no?  Can

17  you identify it?

18         A.      No, no.  Huh-uh.

19         Q.      Okay.  And I notice it is not

20  signed by you.

21         A.      Right.

22         Q.      Okay.  But it appears to be

23  signed by -- Is that Ms. Rountree and

FOSHEE & TURNER COURT REPORTERS

```
1    Mr. Picone's signature?

2              A.      Yes.

3              Q.      So far as you can tell?

4              A.      Yes.

5                      (Defendant's Exhibit 9 was

6                      marked for identification

7                      purposes.)

8              Q.      Okay.  Let me show you one

9    other document.  Let me show you what I've

10   marked as Defendant's Exhibit 9, which is

11   Bates stamped 089 Burke's Outlet, and ask

12   you to take a moment to look at that,

13   please.  Tell me when you're finished,

14   please.

15             A.      Uh-huh.

16             Q.      Are you finished?

17             A.      Yes.

18             Q.      And is that your signature at

19   the bottom of Exhibit 9?

20             A.      It is.

21             Q.      And did you sign that on

22   6/7/04?

23             A.      Yes.
```

**FOSHEE & TURNER COURT REPORTERS**

Page 150

1    Q.    Okay.  Now, if we can look at

2    7, 8, and 9 together, please.  Looking at 7,

3    it indicates that you're being placed on a

4    Performance Enhancement Plan on April 30,

5    '04; is that correct?

6    A.    Right.

7    Q.    And it also indicates, on the

8    introduction, -- introduction, that you

9    received a verbal warning on February 27,

10    '04, and a revisit on March 9, '04; is that

11    correct?

12    A.    I don't know.  I don't

13    remember.

14    Q.    I mean, that's what it shows,

15    does it not?

16    A.    That's what it shows on the

17    paper.

18    Q.    Do you remember a verbal

19    warning on February 27, '04?

20    A.    No, sir.

21    Q.    Do you remember a store

22    revisit on March 9, '04?

23    A.    (Witness shakes head in the

Page 160

1    I'll read that:  In March, 2004, Plaintiff

2    was forced to rehire a white woman and pay

3    her more than comparable coworkers.

4                   Then paragraph eight says:

5    This was yet another instance where

6    Plaintiff's group manager, paren, white,

7    close paren, failed to support her

8    managerial actions where they involved a

9    white.

10                   I would like to ask you about

11   these two, please.  Now, you understand the

12   word "Plaintiff" there means you; right?

13        A.        Yes, sir.

14        Q.        Okay.  So, in March, 2004, it

15   says:  You were forced to rehire a white

16   woman.  And would that be -- Is that a

17   reference to Beverly Armstrong?

18        A.        Yes, sir.

19        Q.        Okay.  How is it that you were

20   forced to rehire Beverly Armstrong?  Tell me

21   what happened there.

22        A.        Margaret told me I had to

23   rehire her.

FOSHEE & TURNER COURT REPORTERS

1          Q.       Okay.   Just that simple?

2          A.       Yes.   She wanted to come back

3    to the company, yes.

4          Q.       Why did she want to -- Why did

5    she want you to hire her, did she say?

6          A.       She didn't say it in words.

7    Beverly used to work for Burke's, managed

8    the other store and left and wanted to come

9    back.

10          Q.       So, she had some experience

11    working for Burke's?

12          A.       Yes.

13          Q.       How long had she --

14          A.       I don't know how long she

15    worked for Burke's.

16          Q.       Okay.   Why did she leave, do

17    you know?

18          A.       Her reasons, no.

19          Q.       Okay.   Why did she want to

20    come back, do you know?

21          A.       No.

22          Q.       Okay.   I take it that when she

23    left, she left under circumstances that

Page 162

1    allowed her to be reemployed?

2         A.    I would think so.

3         Q.    Okay.  And you can leave under

4    circumstances whereby you're not allowed to

5    be reemployed; is that right?

6         A.    I would think so.

7         Q.    Okay.  Would it be reasonable

8    for Burke's to want to rehire an employee

9    who had been a good employee and an

10   experienced employee in the past?

11        A.    I would think so.

12        Q.    Okay.  So, it was reasonable

13   for Margaret to want to rehire

14   Ms. Armstrong?

15        A.    Yeah, I would think so.

16        Q.    Okay.  Why did you not want to

17   hire her?

18        A.    Personally, because Beverly

19   has been problems there before at the store.

20   And I think it would be a lot of friction

21   with two managers, or she used to being a

22   manager, being there at the store.

23        Q.    What problems were you

1    think it would be the same thing I just told

2    you, that I think it would be a lot of

3    frictions in the store.

4         Q.    Okay.  And what was her

5    response to that?

6         A.    She just insisted she wanted

7    Beverly back in the store.

8         Q.    Okay.  And you had to pay her

9    more than comparable coworkers.  What does

10   that mean?

11        A.    Well, she was rehired as a

12   supervisor.  And the supervisor pay was a

13   certain amount they paid every supervisor,

14   but she came in at a different rate.

15        Q.    What rate did she come in at?

16        A.    I couldn't remember the exact

17   figure.

18        Q.    What rate was the supervisor

19   rate of pay?

20        A.    Probably six dollars, 6.50,

21   6.25.  Something like that then.

22        Q.    And you don't have any idea

23   what she came in at?

FOSHEE & TURNER COURT REPORTERS

Page 165

1    A.    The exact figure, no, sir.

2    Q.    Okay.  Were you given an

3    explanation for that?

4    A.    No.  I just was told how much

5    she was going to be hired at.

6    Q.    Okay.  And did you ask

7    Margaret why she would be hired at that

8    amount?

9    A.    No.

10    Q.    So you don't know Margaret's

11    reasons for paying that?

12    A.    (Witness shakes head in the

13    negative.)

14    Q.    And you don't know whether her

15    reasons were discriminatory or not?

16    A.    No.

17    Q.    And the other supervisors, who

18    were they?  You're referring to comparable

19    coworkers there?

20    A.    Yeah.  The other supervisors.

21    I can't remember the names right off.

22          MR. NEWMAN:  Well, he didn't

23    ask you their names.

**FOSHEE & TURNER COURT REPORTERS**

Page 173

1    drunk instead.  So, you're going to take

2    this step-by-step.  What do you do from that

3    point?

4         A.    And if it's the first time it

5    happened, I would talk to you first about

6    it.

7         Q.    Okay.

8         A.    And reinsure you that it's not

9    to happen again.

10        Q.    Actually, it happened three

11   times last month.

12        A.    Well, I don't think it would

13   get that far.

14        Q.    Okay.  It happened once last

15   month.

16        A.    Then I would already write you

17   up.  And then, of course, with writing up,

18   you have to go through --

19        Q.    That's what I'm trying to get

20   you tell me.  When you reach the point where

21   you'll write someone up, what are the steps

22   -- Tell me the steps, A-B-C-D-E-F-G.

23        A.    You have to get your group

Page 174

1    manager's approval.

2          Q.    And that would be Margaret?

3          A.    Right.  You have to get her

4    approval because she has to sign off.  She

5    even has to say if it's okay to write that

6    person up.

7          Q.    Okay.

8          A.    She could say yes or no to it,

9    if she decided against it.

10         Q.    Okay.

11         A.    And she would have to sign off

12   on it.  And then it goes from there.

13         Q.    Okay.  So, she says:  Okay.

14   So then you write it up?

15         A.    Right.

16         Q.    And there's some sort of form

17   probably for that?

18         A.    Right.  Have a witness and

19   sign it up.

20         Q.    Okay.  And then you discuss it

21   with the employee?

22         A.    Yes.

23         Q.    And does Margaret come for

FOSHEE & TURNER COURT REPORTERS

Page 176

1    or, you know, disapprove of it, I can't

2    write them up.

3         Q.    Did Margaret ever tell you:

4    No.  You can't write that up?

5         A.    Yes.

6         Q.    Did she just say:  Is that

7    really serious?  What did she say to you?

8         A.    I mean, sometimes she said:

9    Well, just wait, or maybe we'll watch it

10   next time, or we'll do it next time or

11   things like that.

12        Q.    So, sometimes she wanted to be

13   more lenient than you did?

14        A.    Yes.

15        Q.    Okay.  And did you ever think

16   she was right in that?

17        A.    Well, she could be in some

18   places, but then if it's a continuous thing

19   with that person, then what's going to

20   happen then?

21        Q.    Okay.  Ten says:  Plaintiff's

22   complaints about deficient job performances

23   were ignored by management.  Explain that to

Page 182

1          A.      Yes, sir.

2          Q.      Okay.  Now, paragraph twelve

3    says:  On July 22, 2004, Plaintiff was fired

4    after she requested meeting with her

5    supervisor and management officials to

6    discuss racial discrimination.  Did I read

7    that correctly?

8          A.      Yes, sir.

9          Q.      And the supervisor was

10   Margaret Rountree.  And management officials

11   would have been Richard Picone?

12         A.      That I wanted to discuss this

13   with?

14         Q.      Yes, ma'am.

15         A.      I wanted to have a meeting

16   with both of them.

17         Q.      Yes.  Okay.  I'm just saying

18   that's who you were referring to?

19         A.      Yes.

20         Q.      And you're saying now that at

21   that time you were going to discuss racial

22   discrimination?

23         A.      Well, I told Margaret on the

Page 183

1    phone that I needed to speak to her.  And we

2    need to have meeting.

3           Q.      Yes, you've told me that.

4           A.      Both of us together.  But it

5    wasn't really no meeting.  It was two

6    minutes when they come in and that's the

7    decision they made.

8           Q.      When you called Margaret, you

9    didn't tell her:  I want to talk about

10   racial discrimination, did you?

11          A.      No.

12          Q.      They didn't know that's what

13   you wanted to talk about, did they?

14          A.      I just wanted to have a

15   meeting.

16          Q.      Okay.  And then in page

17   thirteen -- paragraph thirteen, it says

18   that:  Nonwhites are more harshly

19   disciplined, I guess, than whites.

20                  (Off-the-Record discussion

21                   was held.)

22          Q.      Look over your complaint.

23   Now, I haven't asked you about the

Page 206

1      A.      Just help out when they need

2  it.

3      Q.      That's good.  Let me ask you

4  if you've seen this document before?

5      A.      Yes.

6                      (Defendant's Exhibit 10

7                       was marked for

8                       identification purposes.)

9      Q.      And for the Record, I'm

10  showing you a document titled:  Bealls Group

11  of Companies New Hire Acknowledgement

12  Statement.  And are those your initials that

13  appear in the right-hand column?

14      A.      Yes, sir.

15      Q.      And did you receive an

16  employee handbook?

17      A.      Uh-huh.

18      Q.      And did you read the employee

19  handbook?

20      A.      Yes.

21                      (Defendant's Exhibit 11

22                       was marked for

23                       identification purposes.)

FOSHEE & TURNER COURT REPORTERS

Page 207

1          Q.          Okay.  Let me show you what

2     I've marked as Exhibit 11, and ask you is

3     that a copy of the employee handbook that

4     you received?

5          A.          It was a small book.

6          Q.          Well, this is obviously --

7                       MR. NEWMAN:  A copy.

8          A.          It's probably just a copy of

9     it.

10         Q.          Yes.  So far as you can tell,

11    is Exhibit 11 identical, except for its

12    size, to the employee handbook that you

13    received?

14         A.          Yes, sir.

15                          (Defendant's Exhibit 12

16                          was marked for

17                          identification purposes.)

18         Q.          Okay.  Let me show you what

19    I've marked as Defendant's Exhibit 12.  And

20    for the Record, it's titled at the top:

21    Hourly Review For Associate Performance

22    Review for Leslyn Byrd, dated July 5, 2000.

23    And take a moment to look over that, please.

**FOSHEE & TURNER COURT REPORTERS**

Page 210

1          A.      Yes.

2          Q.      When you received it, what did

3     it say?

4          A.      The original?

5          Q.      Uh-huh.

6          A.      I think it's the 24th.

7          Q.      So, the original you received

8     had the 24th, but somebody, for some reason,

9     has scratched through that and put 26?

10         A.      Right.

11         Q.      Otherwise, is the letter,

12    itself, the same as the one you received?

13         A.      Pretty much.

14         Q.      Now, there's some handwriting

15    up here.  And I don't -- I assume that was

16    not on there at the time you received it?

17         A.      Right, right, right.  Just the

18    original.

19         Q.      And attached to this appears

20    to be your application for employment.

21         A.      Right.

22         Q.      Okay.  And if you would just

23    look over that and verify that that is your

**FOSHEE & TURNER COURT REPORTERS**

Page 211

1    application for employment.

2         A.    Yes.

3         Q.    And for the Record, that's

4    pages 05 through 22.  And it says here that

5    your name was -- is it Leslyn Anita Nurse

6    Byrd?

7         A.    Right.

8         Q.    Is Nurse --

9         A.    My maiden name.

10        Q.    -- your maiden name?

11        A.    Uh-huh.

12              (Defendant's Exhibit 15

13                 was marked for

14                 identification purposes.)

15        Q.    Okay.  All right.  Thank you.

16   If you'll look at what I've marked as

17   Defendant's Exhibit 15, please.  And take a

18   moment to look over that and tell me if that

19   is your Store Manager Year-End Performance

20   Appraisal for the performance year ending

21   August 18, '01.

22        A.    I think it is.  You said it's

23   '01.  It's dated in this time, but --

1          Q.     Let me show you what I'm

2    marking as Defendant's Exhibit 19.  And let

3    me ask you if this is a copy of a letter

4    that you sent to Bealls on or about August

5    26, 2004?

6                 I'll tell you what, let me

7    take that one back.  The next one doesn't

8    have that handwriting on it, so it makes a

9    better exhibit.  Do you recognize that

10   document?

11         A.     Yes.

12         Q.     Okay.  Now, in this letter,

13   which you sent to Bealls, and, for the

14   Record, Bealls -- Was it your understanding

15   that Bealls is the parent company of Burke's

16   Outlet Stores?

17         A.     Right.

18         Q.     Okay.  You indicate in the

19   conclusion that there is a pattern of

20   discrimination based on race, national

21   origin and sex carried out by Burke's

22   employees and senior management.  Do you see

23   where I'm talking about there?

Page 222

1          A.      Yes.

2          Q.      Is that the first time you had

3     told anybody at Bealls or Burke's that you

4     believed that to be the case?

5          A.      Yes.

6          Q.      Okay.  And the note on this

7     other one that I started to put in indicates

8     that you were going to meet at the Huddle

9     House in Andalusia at six p.m. on Highway 24

10    I guess -- 84.  My understanding is that

11    meeting had to be put off because of the

12    hurricane, do you recall?

13         A.      But it still was --

14         Q.      But because of that, y'all did

15    meet; right?

16         A.      Yes.  Uh-huh.

17         Q.      My understanding is that --

18    Well, who met with you?

19         A.      I don't remember her name.

20    Someone had called me after they received

21    this letter at the office.  And they wanted

22    to --

23         Q.      Was it Cheryl Woeltjen?  You

Page 223

1    say it.

2           A.       Woeltjen.  She called me.  Is

3    it Woeltjen?  She called me.  I think she's

4    in human resource.  And she personally

5    called me after receiving the letter and

6    wanted to find out some information about

7    the letter, and she sent someone.  I think

8    she couldn't make it.

9                         (Defendant's Exhibit 20

10                        was marked for

11                        identification purposes.)

12           Q.       Look at Exhibit 20.  Is that a

13   letter from her to you dated September 24?

14           A.       Yes.

15           Q.       Do you recall receiving this

16   letter?

17           A.       Yes.

18           Q.       She indicates meeting with

19   Joyce Penrod on Tuesday, September 21.  Do

20   you recall that?

21           A.       Yes.

22           Q.       And apparently there was going

23   to be a meeting but it had to be postponed

FOSHEE & TURNER COURT REPORTERS

Page 224

1    due to two separate hurricane warnings.

2              A.      Right.

3              Q.      Do you recall that?

4              A.      Right.

5              Q.      And what she says is, is that

6    you did not cooperate fully in the

7    conversation with Joyce Penrod based on the

8    advice of your legal representative.  Is

9    that a correct statement?

10             A.      Yes.

11             Q.      Okay.  Did Ms. Penrod seek to

12   meet with you and find out more about the

13   claims that you made in your letter?

14             A.      If she did meet with me?  She

15   did.

16             Q.      And did she try to ask you

17   about the claims that you made in your

18   letter, which is Exhibit 19?

19             A.      Yes.

20             Q.      Okay.  And you told her that

21   based on the advice of counsel, you would

22   not discuss it with her?

23             A.      Not exactly.  Because Joyce

Page 225

1    had that letter in front of her.  So she

2    knew exactly what my claims were.  And

3    that's what I was specifically telling

4    Joyce.

5           Q.       Okay.

6           A.       That you have a copy.  If not,

7    I could give you a copy of the letter.

8           Q.       Okay.

9           A.       So she already had a copy of

10   the letter and knew what the letter has in

11   there.

12          Q.       But I assume that she was

13   asking for more information about it; is

14   that correct?

15          A.       Yeah.  And I gave her some

16   information on it.

17          Q.       Did you tell her that you

18   couldn't discuss it based on advice of

19   counsel?

20          A.       Certain questions I wouldn't

21   discuss with her.

22          Q.       Okay.

23          A.       Certain questions.

Page 227

1       Q.     Yes.

2       A.     Cheryl?

3       Q.     Uh-huh.

4       A.     We just spoke on the phone.

5       Q.     Her name is C-H-E-R-Y-L, and

6 the last name is W-O-E-L-T-J-E-N.  I guess

7 it's Netherlands or something like that.  It

8 seems low country.  Did you ever call her

9 directly and try to talk with her about your

10 claims?

11       A.     We spoke a couple of times, I

12 think, on the phone.

13       Q.     Was that to set up the

14 meeting?

15       A.     To set up -- Oh, before the

16 meeting.  As a matter of fact, when Joyce

17 received the letter, she called me right

18 away.

19       Q.     Okay.  In Exhibit 4, one of

20 the documents is the Job Description Outlet

21 Store Manager that you brought with you.

22       A.     Uh-huh.

23       Q.     Where did you get this

Page 228

1  document?

2          A.      I had a copy with me.

3          Q.      How did you get it?

4          A.      I was keep a copy of it.

5          Q.      Was it given to you when you

6  were promoted to the store manager?

7          A.      Yes.

8          Q.      Okay.  Who gave it to you?

9          A.      I don't recall.  I always kept

10  a copy.  I mean, the manager --

11          Q.      There's nothing wrong with you

12  having it.  I'm trying to figure out how you

13  got it, though.

14          A.      I had it so long -- I mean, I

15  had it in my file, you know, because I had a

16  filing thing.  And I just had it in there.

17          Q.      Well, did someone give this to

18  you when you were promoted?

19          A.      I got a copy when I was

20  promoted.  I had to sign it.

21          Q.      So, there was a copy that you

22  signed?

23          A.      Right.

**FOSHEE & TURNER COURT REPORTERS**

Page 229

1        Q.     That stated that you read and

2  understand the responsibilities?

3        A.     Yes.

4        Q.     Okay.  And did somebody go

5  over these responsibilities with you?

6        A.     When I got hired?

7        Q.     Yes.

8        A.     No.

9        Q.     No.  When you became a store

10  manager?

11        A.     No.

12        Q.     Okay.  Did you have the

13  opportunity to ask anybody questions about

14  that?

15        A.     I had to read that by myself.

16        Q.     Okay.  Did you call anyone, or

17  did you have the opportunity to call anyone

18  and ask them about what it meant?

19        A.     The job description, no.

20        Q.     Did you understand it?

21        A.     I was presented with a file

22  and I had to go over the papers and sign

23  them.